CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 04 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DANA M.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00059 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Dana M. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434. This case is before me by referral under 28 U.S.C. §

636(b)(1)(B). ECF No. 11. Having considered the administrative record, the parties' briefs, and

the applicable law, I cannot find that the Commissioner's final decision is supported by

substantial evidence. Accordingly, I respectfully recommend that the decision be reversed and

the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

1

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social

Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ

asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies

the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed

in the Act's regulations; (4) can return to his or her past relevant work based on his or her

residual functional capacity; and, if not (5) whether he or she can perform other work. *See*

*Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[2] The claimant bears the burden of proof through Step

Four. *Lewis*, 858 F.3d at 861. At Step Five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Procedural History

Dana applied for DIB in June 2017, alleging disability because of back problems, neck

problems, bipolar disorder, anxiety, depression, and high blood pressure. Administrative Record

("R.") 106, 190–96. She alleged that she became disabled on June 1, 2016. R. 107. She was fifty-

one years old, or a "person closely approaching advanced age" under the regulations, on her

alleged onset date. R. 106; 20 C.F.R. § 404.1563(d). Disability Determination Services ("DDS"),

the state agency, denied her claim initially in September 2017, R. 105–22, and upon

reconsideration in May 2018, R. 123–47. In July 2019, Dana appeared with counsel and testified

at an administrative hearing before ALJ Suzette Knight. *See* R. 41–73. A vocational expert

("VE") also testified at this hearing. R. 66–72.

ALJ Knight issued a partially favorable decision on August 20, 2019. *See* R. 17–34

(finding Dana "disabled" as of March 30, 2019, the date her age category changed to "person of

advanced age" under the regulations). She found that Dana had not engaged in substantial

gainful activity since June 1, 2016, and that she met the Act's insured-status requirements

through March 31, 2019.[3] R. 20. At step two, ALJ Knight found that Dana suffered from the

following "severe" impairments during the relevant time: degenerative disc disease of the spine,

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Dana had to "prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656. ALJ Knight found that Dana established disability as of March 30, 2019. *See* R. 33.

osteoarthritis of the right knee, osteoarthritis of the bilateral shoulders, essential hypertension, obesity, depressive disorder, generalized anxiety disorder, Bipolar I disorder, and panic disorder. R. 20. Her remaining impairments were found to be non-severe. R. 21. None of Dana's impairments met or equaled any relevant Listing. R. 21–24 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 11.02, 12.04). In evaluating Dana's mental impairments under the "paragraph B" criteria, ALJ Knight found that Dana had "mild limitation" in her overall ability to adapt and manage herself and "moderate limitation[s]" in her overall abilities to understand, remember, or apply information; to interact with others; and to concentrate, persist, or maintain pace. R. 22–24.

Turning to Dana's RFC, ALJ Knight determined that she could perform "light"[4] work with additional limitations. R. 24. Dana could "occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes or scaffolds." *Id.* She could "tolerate occasional exposure to vibration," and she was "able to understand, remember, and carry out simple and routine work-related tasks and [could] concentrate for periods of two hours on said work-related tasks before requiring a break." *Id.* Lastly, Dana could "occasionally interact with supervisors, co-workers, and the public." *Id.* Based on this RFC finding and the VE's testimony, ALJ Knight concluded that Dana was unable to return to her past relevant work.

ALJ Knight then non-mechanically applied the age categories of the regulations and determined that on March 30, 2019, one day before her DLI, Dana became an "individual of advanced age." R. 32 (citing 20 C.F.R. § 404.1563). ALJ Knight found that prior to March 30,

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

2019, Dana could have performed certain unskilled "light" jobs existing in significant numbers, R. 32–33 (citing R. 70–72), but after that date, no jobs existed in significant numbers that Dana could perform, R. 33 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.06 (directing a finding of "disabled" for a person of advanced age who is a high-school graduate, previously performed skilled or semi-skilled work, and is limited to "light" exertional work by reason of his or her severe medical impairments)). Thus, ALJ Knight concluded that Dana was "not disabled prior to March 30, 2019, but became disabled on that date and [] continued to be disabled through the date of [her] decision." R. 34. The Appeals Council denied Dana's request for review, R. 1–6, and this appeal followed.

### III. Discussion

Dana first argues that ALJ Knight erred by failing to account for her "moderate" limitations in concentration, persistence, and pace ("CPP") in her RFC determination. Pl.'s Br. 9–11, ECF No. 18. She further argues that the ALJ provided an insufficient basis for rejecting the opinion of Christopher Cousins, Ph.D., who performed a consultative psychological evaluation of Dana. *Id.* at 10–11. Third, Dana contends that ALJ Knight erred by improperly discrediting her subjective allegations of pain and other impairment-related symptoms. *Id.* at 11–16. Lastly, she argues that the ALJ improperly rejected the opinion of Shawne Bryant, M.D., who performed a consultative physical evaluation on Dana. *Id.* at 16–20. Dana's first and third arguments are persuasive, and her others are not addressed.

A.    *Summary*

1.    *Relevant Medical Evidence*

In June 2016, Dana presented to the emergency department ("ED") at Sentara Virginia Beach General Hospital. *See* R. 415–39. She "appear[ed] anxious and upset" and said she had

fallen earlier that day resulting in an injury to her coccyx, aggravating a prior rib injury, and causing difficulty breathing and soreness in her neck. R. 417, 419. Dana also complained of back pain, knee pain, and a history of chronic neck pain. R. 417–18. Prior to presenting to the ED, but after her fall, which was caused by a dog bumping her, Dana ran a few errands before going grocery shopping. R. 418. Dana said that "in the grocery store, her rib pain worsened and she began to feel short of breath, so she took her groceries home and came to the ED." R. 419. Examination revealed normal range of motion in her neck, tenderness in her chest, and tenderness to palpation in her lateral right chest wall. R. 420. She was alert and oriented to person, place, and time, and she had normal affect and judgment. *Id.* Imaging performed on Dana's coccyx that day revealed "[n]o evidence of acute osseous abnormality." R. 437. A CT scan of Dana's cervical spine showed "[s]evere degenerative disc disease at C5-C6 and C6-C7," "no evidence of acute fracture," "[n]o limiting spinal canal stenosis," "severe" foraminal stenosis bilaterally at C5-C6, and "moderate" foraminal stenosis on the left at C6-C7. *Id.* At a follow-up appointment the next day, Dana complained of pain and bruises on her right breast, the right side of her chest, and on her knees. R. 460, 462. It was noted that she had been "decreasing her Cymbalta and she ha[d] been fine," *id.*, her mood was "improving a little," R. 462, and she "continued to feel better since her depression when her husband died [and she was] getting back to work and dating a little," *id.* (cleaned up). Exam findings were normal. R. 463.

In July, Dana underwent a CT scan of her chest that revealed "[n]ondisplaced fractures of the posterior left eighth and ninth ribs," R. 320, and that her "[p]reviously demonstrated left posterior rib fractures ha[d] healed," R. 321. There was also a "[f]lexion-distraction fracture at T11-T12," "[e]vidence of T11-T12 posterior ligamentous disruption," and a "T12 anterior wedge compression fracture with approximately 50% height loss" which "[r]esult[ed] in low-grade

spinal canal compromise." *Id.* Dana was prescribed Norco and referred to a spinal surgeon. R. 321–22.

In October, Dana complained to Laura Sample, M.D., that her fall in June had aggravated a neck injury she sustained in a prior automobile accident. R. 468. Dana requested Norco until she could see pain management, "ha[d] been taking more Advil and Aleve for her back pain," and "continue[d] to take Cymbalta," which also helped her pain. *Id.* On exam, she exhibited decreased range of motion, tenderness, and pain and spasms in her cervical and thoracic spine. R. 469. Dana's mood, memory, affect, and judgment were normal. R. 469. Dr. Sample ordered MRIs of Dana's cervical and thoracic spines, R. 470, which were performed that day, R. 332–35. The cervical MRI revealed "[m]ultilevel degenerative disc disease with mild flattening deformation of the ventral cervical cord at C5-C6," mild canal stenosis at C6-C7, and "[f]acet arthropathy and uncovertebral proliferative changes result[ing] in high-grade bilateral foraminal stenoses at C5-C6 and C6-C7." R. 333. The thoracic MRI revealed "[m]oderate T12 and L1 wedge compression [that was] chronic," "[n]o acute or significant residual disc or ligamentous abnormality" at any level, "[p]rominent T11-T12 disc osteophyte complex with mass effect upon the thecal sac but no significant canal stenosis or thoracic cord impingement," and "less prominent degenerative disc disease and facet arthropathy throughout the thoracic spine." R. 335.

In May 2017, Dana saw Patrick Godwin, M.D., to establish care for pain management, anxiety, hypertension, hypothyroid, and gastroesophageal reflux disease ("GERD"). Dana said she had back, shoulder, and neck pain, describing it as a "knife-like, sharp pain" that "radiate[d] down [her] right arm." R. 441. Her pain was "improved by [d]eep tissue massage, heating pad, [and] medication as prescribed," and it was aggravated by "movement, activity, [and] cold rainy

weather." *Id.* On exam, Dana had full range of motion in her neck, normal shape and expansion

in her chest, and her senses were intact. R. 442. Dr. Godwin assessed hypertension, low back

pain at multiple sites, hypothyroidism, GERD, insomnia, generalized anxiety disorder, and

history of seizure disorder. *Id.*

  In August, Christopher Cousins, Ph.D., performed a consultative psychological

evaluation of Dana. R. 488–93. Dana said her physical impairments caused "pain all over [her]

body" and reported that she had twice previously sustained head injuries in automobile accidents.

R. 489. She "reported no prior inpatient psychiatric hospitalizations or utilization of outpatient

mental health services." *Id.* Dana described her behavior as "manic," which Dr. Cousins opined

was a clinically accurate assessment. *Id.* ("Dana used the term 'manic' to describe her behavior.

It is also worth noting that she used the term correctly to describe what appeared to the examiner

as classic instances of severe manic behavior."). He noted that Dana's bipolar disorder had been

self-diagnosed, but he found that "Dana's behavior during th[e] evaluation, as well as her

described history of behavior, a[re] certainly characteristic of classic bipolar manic symptoms."

*Id.* Further, based on Dana's unusually "verbose" responses in her July 2017 Function Report,

Dr. Cousins "wonder[ed] if there [was] certainly an element of mania present when she was

completing that paperwork." *Id.* ("[I]n the function report completed by Dana, she was rather

verbose in many of her responses, much more so than this examiner typically sees. The examiner

could not help but to wonder if there is certainly an element of mania present when she was

completing that paperwork."). Dr. Cousins noted that the medical records he reviewed

documented only a history of anxiety. *Id.*

  Dana reported that she lived with her mother, who she described as critical, but she got

along with her "just fine." *Id.* Dana received some financial assistance from her boyfriend, but

also remarked "that she sold her house and went on very lavish trips." R. 490. Dana also

"described difficulty sleeping at night," "mentioned she would do the cooking, though she was

quick to remark that she can only stand for about 15 minutes before her back starts to hurt," and

"reported having some friends who visit her and remarked that she will visit friends." *Id.*

Dana was pleasant and "cooperative throughout the evaluation," but she "[e]ssentially . . .

presented as an individual in a manic episode." R. 491; *see also* R. 492 ("Basically, Dana's

clinical presentation was dominated by the presence of mania."). More specifically, Dr. Cousins

observed that her "affect and mood were quite labile," her mood was "elevated with underlying

irritability, and her "speech was very loud and pressured" and "often tangential." *Id.* She also

"shifted frequently in her chair, exhibiting significant restless psychomotor agitation." *Id.* Dana

said she felt like she wanted to cry "[a]ll the time," but Dr. Cousins observed "no evidence of

psychotic thought process," and Dana denied any history of suicidal or homicidal ideation. *Id.*

She did not know the day of the week, but was otherwise oriented to time, person, and place; her

immediate and recent memory appeared "poor"; her remote memory appeared "fair"; her abstract

thinking ability was "fair at best"; and her general fund of information, calculation ability,

judgment, sensory, and reasonability appeared "good." *Id.*

In his summary, Dr. Cousins noted "no evidence of malingering or symptom

exaggeration" and Dana's "presentation was consistent throughout the evaluation," and

"consistent with a classic manic episode." R. 492. He described her spending sprees as "manic,"

noting that Dana said she often falls into a state of "deep depression" following manic phases

and will "'stay in bed for days.'" *Id.* Observing that Dana reported she felt anxious during this

evaluation, he noted "essentially only one time when that was apparent" on exam. *Id.* Based on

"what [he] observed during th[e] evaluation," and Dana's described symptoms, Dr. Cousins

formally diagnosed Bipolar I disorder. *Id.*

Dr. Cousins then evaluated Dana's functional capabilities "[b]ased on performance on the

current evaluation," and found that she "appear[ed] capable of performing simple and repetitive

tasks." *Id.* "In light of the severity of [Dana's] bipolar symptoms," Dr. Cousins found that it was

"highly unlikely" she could perform detailed and complex tasks. *Id.* Although Dana would not

require special instructions, Dr. Cousins "suspect[ed] that during periods of mania, Dana would

likely require frequent redirection to tasks presented to her." *Id.* He found it "unlikely Dana

would be able to maintain regular attendance in the workplace, perform work activities on a

consistent basis, and complete a normal workday or workweek without interruption." *Id.* He also

suspected she would have some difficulty dealing with supervisors, *id.*, found it unlikely that she

could appropriately interact with co-workers, and "expected [her] to have difficulty coping with

typical stressors encountered in competitive work," R. 493.

In September 2017, Dana saw Shawne Bryant, M.D., from the Virginia Department of

Rehabilitative Services, for a consultative physical evaluation. R. 497–501. Dana complained to

Dr. Bryant of hypertension, acid reflux, insomnia, rib fractures, hypothyroidism, and back, neck

and shoulder pain. R. 497. Dr. Bryant noted that Dana was "able to feed, bathe, and dress

herself" and could "do light cooking and house cleaning." R. 498. On exam, Dana was "able to

get on and off the examining table, up and out of the chair, and remove[d] her shoes without

assistance," and she "was not short of breath and did not present with an assistive ambulatory

device." R. 499. She was alert and oriented and had appropriate affect and good cognition. *Id.*

Her neck was supple without masses, straight leg raising test was negative, and she had "good

hand eye coordination." *Id.* Additionally, "[t]here was no cervical spine or other spinal

tenderness to palpation," her "ambulation was normal," she could heel, toe, and tandem walk

without difficulty," and she could "stand on one foot bilaterally and squat to 30 degrees with

complaints of back pain." R. 500. Dana had some difficulty "following instructions due to

decreased concentration," 5/5 grip strength, 5/5 muscle strength in her distal muscle groups, 4+/5

muscle strength in her proximal muscle groups, *id.* and decreased range of motion in her cervical

and thoracolumbar spine, shoulders, and hips, R. 496.

    Dr. Bryant observed that Dana's "physical findings were consistent with her alleged

complaints." R. 500. She opined that Dana could "sit, stand, and walk 30 minutes at a time"

secondary to back and hip pain, R. 500, and she could stand and walk for three hours and sit for

six hours in an eight-hour workday, R. 501. Dr. Bryant opined that Dana could carry and lift ten

pounds frequently and twenty pounds occasionally; could occasionally perform manipulative

maneuvers and reaching; and could occasionally bend, stoop, crouch, and squat. *Id.* "Some

communicative limitations may be present due to decreased memory, difficulty with instructions,

and a history of mental illness." *Id.* (cleaned up).

    In November, Dana presented to the ED and was attended to by Ossian Wynne, M.D. R.

511–13. She complained of pain in her right shoulder, her upper back, her hand, and in the right

side of her neck after having slipped off a step stool the night before. R. 511. On exam, the range

of motion in her right shoulder was intact, and she had no bruising or deformities. R. 513. Dr.

Wynne reviewed X-rays of Dana's cervical and thoracic spines, hands, and right shoulder. R.

525–27. The X-rays of her spine revealed "[n]o fracture or static subluxation of the cervical

spine," "[s]evere cervical degenerative disease of C5-C7 with bilateral uncovertebral neural

foraminal stenosis at these levels," R. 525, and "[a]nterior wedge compression deformities of the

T12 and L1 vertebral bodies," R. 526. X-rays of Dana's hands and right shoulder showed "[n]o

fracture or dislocation" of the right shoulder or left hand and "[h]igh riding position of the right glenoid humeral joint, suggestive of chronic rotator cuff pathology." R. 527. Dr. Wynne diagnosed her with a right shoulder contusion, instructed her to wear a sling for two to three days, provided pain medication, and noted that she "may need an MRI to evaluate a new rotator cuff injury." *Id.* Also in November, Dana began attending individual therapy sessions at Southside Community Services Board ("CSB") for her anxiety. R. 537. Dana believed that previous seizures she experienced had affected her memory and said she had "bad mood swings" and manic episodes with extreme irritability. *Id.* Because of anxiety, she was unable to focus, she shopped only when stores were at their least crowded, and she did "not get out of bed for days at a time, and ha[d] no desire to get dressed or do anything." *Id.*

In February 2018, Dana expressed nearly identical complaints at a psychiatric evaluation conducted by Geeta Nathan, M.D. R. 539. Her mental status examination revealed a depressed mood; a mildly restricted thought process; logical, linear, and organized thought content; no suicidal or homicidal ideation; fair grooming, and overall fair insight and judgment. R. 540–41. Dr. Nathan diagnosed Bipolar Disorder and Panic Disorder, prescribed Neurontin, Cymbalta, and Topamax, and recommended therapy. R. 540.

Later in February, Dana presented to VCU Health's Orthopedic Surgery Clinic complaining of pain in her shoulders. R. 661. It was noted that she had been given a "steroid injection with limited relief." *Id.* An "[e]valuation of the shoulder reveal[ed] no warmth or erythema," but she did have atrophy. *Id.* "Range of motion bilaterally include[d] elevation of 70 degrees, [and] external rotation of 10 degrees." *Id.* X-rays performed on Dana's shoulder that day revealed "massive rotator cuff tearing." *Id.*; *see also* R. 670 (noting "bilateral rotator cuff insufficiency and atrophy"). The attending physician recommended surgery. R. 661. Dana

12

underwent a reverse total right shoulder arthroplasty and distal clavicle resection shortly

thereafter. *See* R. 554–55; R. 619 (noting on 3/14/18 that Dana's "RIGHT shoulder was recently

operated on and surgery is planned for her LEFT shoulder as well").

Dana also complained that day of neck and back pain resulting from various falls and

fractures. R. 678. She "[s]tated that she cannot stand for more than 15 minutes and the pain will

become severe in her mid-lower back," and she had "shooting pain down her spine that ends in

her sacrum." *Id.* Dana was experiencing thoracic pain, neck pain that went into her hands with

numbness, tingling, and weakness," and "[o]ccasional low back pain when she is up for too

long." *Id.* She described her pain as "sharp, dull, deep, aching, cramping sensation, and

throbbing," and she rated it an eight-out-of-ten both that day and on average. *Id.* Heat, pain

medication, rest, and repositioning were listed as alleviating factors. *Id.* Anxiety and depression

were noted in Dana's review of systems. R. 679. On exam, her ambulation was steady but with a

limp favoring her right side, she could go up on her heels and toes, her spinal range of motion

was full and painless, and she was not noted to use any assistive devices. R. 680. She showed

"[a]cutely positive bilateral shoulder impingement signs," had a negative straight leg raising test,

and had appropriate mood and affect and normal judgment. R. 681. Lynn Gufeld, NP, assessed

"bilateral upper extremity weakness, acutely positive shoulder impingement signs, paresthesia in

her hands and exaggerated hyperreactive reflexes to upper and lower extremities." R. 682

(spelling corrected). NP Gufeld ordered an MRI of Dana's cervical spine and referred Dana "to

pain management as soon as she can as she is requesting additional pain medications which I am

not comfortable prescribing for her chronic pain as she is already on many analgesics." *Id.* The

X-rays revealed "[l]ikely chronic vertebral compression fractures in the setting of osteopenia

consistent with osteoporosis," and a "[s]uperior T7 vertebra endplate deformity," which "may

indicate [a] fracture, as well." R. 669. They also demonstrated "[m]oderate cervical

spondylosis," "[m]ild lumbar spondylosis," and "[f]indings consistent with bilateral rotator cuff

insufficiency and atrophy." R. 670. A subsequent MRI of her cervical spine revealed

"[m]oderate/severe spondylosis" that was "most significant at C5-C6 with moderate central canal

and severe bilateral foraminal stenosis." R. 645–47 (Feb. 18, 2018).

In March, Dana returned to VCU Health for a follow-up appointment for neck, back, and

bilateral shoulder pain, well as pain, numbness, and weakness in her arms and hands. R. 590–

626. She reported that her symptoms had been present for several years and that she had been

dropping things. R. 614. On exam, she continued to ambulate steadily, had a limp favoring the

right side, was still able to walk on her heels and toes, had full and painless spinal range of

motion, did not use any assistive devices, and her mood and affect were appropriate and her

judgment normal. R. 618. She had decreased strength (3/5 to 4/5) throughout her left upper

extremity, and her right arm was in a shoulder sling immobilizer. *Id.* In her assessment, NP

Gufeld noted that Dana had "some non-dermatomal paresthesias with movement and hand

elevation as well as hyperactive upper and lower extremity reflexes." R. 619. NP Gufeld opined

that the compression shown on Dana's MRI "could be causing her pain." *Id.* Dana was

"amenable to cervical surgery once her shoulder surgeries [were] completed," *id.* (cleaned up),

but NP Gufeld thought there was "currently no urgent need for surgery" given that Dana had "no

new acute symptoms," *id.*

At a therapy session in March, Dana reported trouble sleeping, and she was still

experiencing irritability and "a lot of anxiety when she ha[d] to go out, and avoid[ed] it if

possible." R. 542. At a psychiatric follow-up later in March, Dana was "staying in bed more with

mood swings," but she continued to deny suicidal or homicidal ideation or hallucinations. R.

544. In April, Dana's "irritability [was] much better," and she was sleeping "fair" after the

increase in the dosage of her Gabapentin, but she "had some anxiety." R. 810.

Also in April, Dana underwent a physical therapy session shortly after her shoulder

surgery. R. 711–13. Dana reported difficulty getting dressed and performing household chores.

R. 713. On exam, she was tender to palpation, had "increased tissue turgor along the

suboccipital, supraspinatus, and periscapular region," and displayed "tenderness along the

ant[erior] glenohumeral joint capsule." R. 712. Her left shoulder flexion, extension, and external

rotation were 3+/5, and her internal rotation was 4/5. *Id.* She had "impairments in ROM and

strength," and postural limitations. R. 713.

Later in April, Dana returned to VCU Health for a follow-up related to her shoulder

surgery. R. 554–55. Nathan Boardman, M.D., noted that her "shoulder look[ed] great," and had

"[b]etter than half normal motion" with "[g]ood strength." R. 554. X-rays of her right shoulder

"look good." R. 555. Dr. Boardman planned to "step-up" Dana's therapy and ordered her back in

two months for a clinical re-evaluation. *Id.* That same day, Dana complained of neck pain

radiating to her arms and upper- and mid-back pain that she described as "dull, chronic, constant,

[and] worse with exertion, bending, [and] lifting." R. 580. The pain would also cause her fingers

to go numb, and she rated it a "9/10 at worst." *Id.* On exam, she had a restricted ROM in her

neck, "mild" tenderness to palpation over her bilateral cervical facets, 5/5 upper extremity

strength bilaterally, tenderness to palpation posteriorly and over the AC joint in her left shoulder,

and pain with abduction of her left shoulder past 90 degrees. R. 584. An attending physician

noted that Dana had "failed NSAIDs," recommended Tylenol and considering a TENS unit, and

referred her to physical therapy. R. 578. After reviewing the MRIs of Dana's cervical spine, he

"[d]oubt[ed] she would benefit from interventional techniques," and said he would "titrate

gabapentin to [a] more effective dose." R. 579. Regarding Dana's anxiety and bipolar disorder, it

was noted that she was taking Prozac, Seroquel, and Klonapin, that she had failed Cymbalta, and

that therapy was helping. *Id.* About a week later, Joy Powell, PT, indicated that Dana's shoulder

pain was a 2/10, but Dana complained of stiffness and had a painful ROM. R. 705.

Dana again attended psychiatric therapy in June, reporting that she had "continued

depressive symptoms and anxiety" and "struggle[d] to control her anger at times." R. 814. Dana

also said she had a panic attack the week prior while grocery shopping. *Id.* She "report[ed] only

being able to sleep a few hours each night and that she [did not] leave the house much." *Id.* At a

later June therapy session, Dana continued to report anxiety and panic attacks and said her

chronic back pain caused trouble sleeping; she also felt her Prozac did not help. *Id.* In July, Dana

told her therapist she still experienced sleeping issues, irritability, and anxiety, and lacked the

motivation or energy to do things. R. 820. She made similar reports in August, stating that she

was "quick to get mad and snap on people," reporting mood swings, and questioning the

effectiveness of her medication. R. 822. She reported that her shoulder was "doing well after her

surgery." R. 823. In September, Dana said she had "progressed with her goals in therapy," was

"placed on medication management," and "agree[d] to ask to re-open therapy services should she

feel the need." R. 828. At a psychiatric follow-up later that month, Dana said she had not "felt

this good in a long time," and reported mood improvement, but said she only slept about four

hours and still had some mood swings. R. 830.

In October 2018, Dana visited a GoDocs clinic, complaining of "pain in her right knee

which is chronic in nature and [said] she [was] currently awaiting a right knee replacement in 1

week." R. 773. Examination revealed no impairments in her functional and cognitive status, *id.*,

and she had full range of motion against gravity and resistance in all extremities "with the

exception [o]f the right patellofemoral joint which [was] tender to palpation," R. 774. Dana was given injections for her knee pain. R. 775. And, in November, Dana underwent a patellofemoral arthroplasty ("PFA") on her right knee. R. 838 ("[Dana] is a 54yo F who presents today for routine follow-up s/p R PFA with Dr. Satpathy 11/07/2018.").

In January 2019 at a psychiatric follow-up, Dana "report[ed] feeling depressed with crying episodes". R. 843. She slept well, but "ha[d] low motivation and energy," laid in bed often, had not seen improvement after increasing her Effexor dosage, and "tend[ed] to feel worse during winter." R. 843. In February, she was "feeling better, [and] getting out of bed more." R. 846. She denied suicidal or homicidal ideation and was "receiving therapy for her knee." *Id.*

Also in February, Dana returned to the GoDocs clinic to refill her medications. R. 779. Examination findings noted obesity, but otherwise were normal. R. 779–80. Dana was diagnosed with obesity, hypothyroidism, bipolar disorder, GERD, essential hypertension, other specified depressive episodes, and other seasonal allergic rhinitis. R. 781. She was continued on all her current medications and advised to follow up in three months. *Id.*

At a February follow up for her knee surgery, Dana reported that she continued to experience pain, primarily during extension, but physical therapy provided some relief. R. 838. Dana denied any recent falls and was noted to be "[a]mbulatory with [a] cane intermittently." *Id.* On examination, she had a slightly antalgic gait, mild tenderness to palpation overlying her quad tendon and patella, no palpable crepitus, 5/5 strength, no extension lag, and resistive range of motion in knee flexion and extension. R. 840. Laura Giambra, PA, noted that Dana was doing physical therapy, recommended "continued conservative management with close follow-up," and prescribed oxycodone. R. 841.

17

At a psychiatric follow up in March, Dana reported that she was feeling better and her crying spells had decreased after increasing the dosage of Zoloft. R. 849. She "still ha[d] variable moods and baseline irritability," reported sleeping around seven hours a night, denied suicidal or homicidal ideation, and rated her mood a six-out-of-ten. *Id.* On exam, her mood was depressed, affect was congruent and mildly restricted, and insight and judgment were fair. R. 850.

In late April, Dana had her three-month follow up with GoDocs. *See* R. 784–87. She "complain[ed] of pain in [the] middle of her back that has been ongoing for quite some time," and she "was wondering if [they could] do trigger points to help with the muscle soreness in the center of her back on either side of the thoracic spine." R. 784. Physical and mental exam findings were normal, except she had "pain and tenderness to palpation along the center of the thoracic spine as well as the muscles on either side around T4 through T8." *Id.* She was continued on her medications, including Ambien and Clonazepam, and injections were ordered, R. 786. At a follow up two weeks after Dana received injections, she "state[d] she felt much relief for the first 2-3 days," but that her pain had returned to the same extent as before. R. 798. She said the pain was variable at times, but that it often caused "distress and limited mobility," and she rated it a ten-out-of-ten at its worst. *Id.* On exam, Dana had tenderness on palpation to her cervical, thoracic, and lumbar spines, but all other findings were normal. *Id.* She was again given injections. R. 799. When she followed up later in May, she said that the injections provided relief only for a few days, but her pain returned after physical therapy. *Id.* Examination findings were the same, she had a smooth gait with an equal stride and good base of support, and her recent and remote memory were intact. *Id.*

At a psychiatric evaluation in early May, Dana reported an improved mood, and she said she had been getting out and walking more and had improved her eating. R. 852. She was

continued on Zoloft and Seroquel, and a healthy diet and exercise were recommended. R. 853.

At an appointment a couple weeks later, however, she reported being "depressed and anxious"

and feeling "worthless." R. 855. She said she was having issues with her mother and boyfriend,

both of whom she lived with, because "they 'start in on her' and act as if she can control her

[mental] illness." *Id.* She described her boyfriend as "hateful," and she said that she "ha[d]

minimal social supports and [did not] like crowds." R. 856; *see also* R. 865 (Dana similarly

reporting increased depression in May 2019 because of a conflict with her mother). She also had

issues performing her activities of daily living. R. 856. Her thought process and content were

normal, she was tearful, she had good insight and judgment, she had signs of depressive-like and

manic-like behavior, and she slept normally. R. 857. She complained of back pain, and her

history of falls was noted, as well as the fact that she "sometimes use[d] a cane." R. 859–60. She

was assessed with Bipolar I disorder, panic disorder, and an unspecified injury of the head. R.

861. Erika Scruggs, the examining therapist, opined that Dana had a major mental disorder that

was expected to require services of an extended duration. R. 862.

Dana attended another psychiatric therapy session in June for her "struggles with

continued symptoms of depression, including loss of interest in activities, lack of appetite,

feelings of worthlessness and [a] low desire for socialization." R. 868. Although Dana was

"tearful toward the end of the session," this was noted to be an improvement over her previous

session. *Id.* Dana said she had difficulty with her daily routine and memory and she felt a

compulsion to do certain things, like buying and maintaining an excessive number of notebooks.

R. 868–69; *see also* R. 870 (telephonic encounter wherein Dana was noted to have "detailed

obsessive compulsive symptoms" and continued anxiety). Dana was taking Klonopin, but she

felt it was not helping and her anxiety was worsening. R. 869.

Also, in May and June, Dana saw NP Gufeld, complaining of various back issues. R. 873–74. In a "To Whom It May Concern" letter, NP Gufeld noted that Dana's primary diagnoses were severe cervical stenosis, myelopathy, and cervical degenerative disc disease and her "pain and disability [were] likely to persist and progress if she [did] not have a cervical spinal surgery." R. 873. For those impairments, NP Gufeld would refer Dana to neurosurgery. *Id.* She also ordered an electromyographic study based on "diffuse symptoms to [Dana's] upper extremities that [she] believe[d] may be caused by other etiologies." *Id.* Examination displayed "decreased cervical range of motion, decreased right upper extremity strength, diffuse hyperreflexia, a positive Hoffman's, and muscle pain and spasm of her thoracic spine." *Id.* Her symptoms "correlate[d] well with her imaging" and did "not appear to be supratentorial." *Id.* Dana said her symptoms had been present for more than twelve months, and NP Gufeld "expect[ed] that they [would] continue to last longer if not surgically repaired." *Id.*

NP Gufeld noted that she "cannot comment on [Dana's] abilities and limitations" because she "do[es] not test [her] patient repeatedly and through different circumstances" during office visits "to determine the length of time she can sit, stand or perform different activities[.]" *Id.* Nonetheless, NP Gufeld opined that Dana "should use a cane or assistive device as she is a high fall risk" based on her cervical spine pathology. *Id.* She also found that Dana's "symptoms [were] fairly significant and pose[d] safety and mobility limitations that would make it difficult for her to have a manual occupation or a job that requires prolonged standing, walking, or repeated changes in position." *Id.*

2.    *Dana's Statements*

In July 2017, Dana submitted a Function Report to DDS. *See* R. 237–44. She said her daily activities varied from day to day depending on the amount of depression and anxiety she

experienced. R. 237. Her back and neck pain caused functional difficulties, and her inability to do physical activities worsened her depression. *Id.* She and her mother each had a dog, but her mother mostly cared for them, although Dana would sometimes let them out or give them treats, and her dog slept with her. R. 238. She rarely cooked simple meals and said cooking "kill[ed] [her] back." R. 239. She did light laundry at times and would sometimes clean the kitchen, but she was unable to vacuum or mow the lawn because of her pain. *Id.* If the weather was nice, she would go outside four to five times a week, and she could drive and shop in stores, but would only go to stores every couple of weeks. R. 240. She experienced anxiety when around the public. *Id.* Her hobbies included reading, watching TV, knitting, sitting in the sun, and being driven through the countryside. R. 241. She would watch movies, sit in the yard, and go to dinner at quiet places with friends, but said she rarely went out and described incidences of having forgotten where she was while driving. *Id.* Dana said her impairments limited her abilities to lift, squat, stand, bend, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and follow instructions, and in her ability to use her hands. R. 242. She had trouble handling stress or changes in routine, and she was "worried about what [was] going to happen to [her]," which made her "more anxious and depressed." R. 243.

In March 2018, Dana submitted a second Function Report to DDS. *See* R. 255–62. Her daily activities continued to vary based on her mental state and some days she was completely bedridden. R. 255. She again said that she cared for pets, but her mom did most of the feeding and walking. R. 256. She had chronic insomnia and could not sleep because of her pain. *Id.* Routine tasks took longer, and she needed help getting dressed after her recent surgery. *Id.* She cooked meals daily for anywhere from ten minutes to one hour, but doing so caused back pain, but she also reported cooking only "short fast meals now." R. 257. She was able to dust and

empty small trash cans. *Id.* She did not do yardwork, but she would go outside two or three times

a week. R. 258. She said she could not drive for four more weeks because of her recent surgery,

and she shopped for groceries about once every two weeks, but would usually shop at night to

avoid crowds. *Id.* Her only hobbies were watching television and reading, she would take car

rides with others on nice days, and she would "talk to a couple of people on the phone." R. 259.

She experienced mood swings, and she could walk for only about ten minutes before needing to

rest for five-to-ten minutes. R. 260. She also continued to have trouble handling stress and

changes in routine. R. 261. She did not report requiring any assistive devices for ambulation. *Id.*

In July 2019, Dana testified at a hearing before ALJ Knight. *See* R. 41–73. She testified

that she had a driver's license, but "since that last wreck" she only drove "maybe" twice per

week, usually to Walmart or Burger King. R. 48. Her boyfriend drove her to the hearing. *Id.* She

would "sometimes" read fiction books, but other times doing so would make her eyes blur. R.

49. Pain in Dana's neck, shoulder, back, hip, ribs, knees, arms, and hands, as well as her anxiety

made her unable to work, and standing for more than about fifteen minutes felt like "somebody[]

putting a knife" in her back. R. 55. Her anxiety had caused her to have a seizure in the grocery

store. *Id.* She had been attending physical therapy and reported some relief, but also said it made

her neck pain worse. R. 56. Dana had difficulty with memory and concentration, would need to

write herself reminders, and often ended up with several of the same reminders. R. 59. Her daily

routine depended on how well she slept the night before, but it often consisted of making

breakfast for herself and her mother, straightening up her room, and trying to get out and sit in

the yard with her dog. R. 60. She said she did see some friends from time to time, but she did not

go out to dinner "or none of that" because of financial problems and her anxiety in crowds. R.

61. She could dress herself for the most part, but had some difficulty hooking her brassiere and

getting out of the tub. *Id.* Regarding household chores, Dana said she and her mother "do a little bit and then [] sit down." R. 62. *Id.* She was unable to knit because she could not get her fingers to "work right." R. 63. When her attorney asked about her cane, Dana said she required the cane for balancing and ambulation because of right hip pain and that it was prescribed by a physician who worked alongside her surgeon. R. 64. Dana also said that one winter she went a full month without leaving her home. R. 65.

    3.    *DDS Opinions*

In September 2017, DDS consultants William Rutherford, Jr., M.D., and Julie Jennings, Ph.D., opined as to Dana's RFC. *See* R. 105–22. Dr. Rutherford found Dana could lift and carry twenty pounds occasionally and ten pounds frequently and she could stand and/or walk for about six hours, and sit for about six hours, in an eight-hour workday. R. 116. He also found that she could occasionally climb ramps, stairs, ladders, ropes and scaffolds and occasionally balance, stoop, kneel, crouch, and crawl. R. 116–17. Explaining these limitations, Dr. Rutherford noted that, although Dana's record showed "multiple complaints" about "her joints and . . . physical pain, on her most recent [consultative] exam she presented with no assistive device, no problems ambulating, and being intact with coordination, station, strength, and resources. She is able to feed, bathe[,] and dress herself," can do "light cooking and house cleaning," and has medications "which she utilizes to control" her symptoms. R. 116 ("Therefore the [claimant] would be restricted to performing light work."). He also opined that Dana should avoid even moderate exposure to workplace hazards given her history of seizure disorder. R. 117–18. Dr. Jennings determined that Dana was moderately limited in her abilities to understand and remember detailed instructions, to maintain concentration for extended periods of time, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to

perform at a consistent pace without an unreasonable number and length of rest periods, to

interact appropriately with the general public, and to accept instructions and respond

appropriately to criticism from supervisors. R. 118–19. Regarding Dana's moderate limitations

in concentration, persistence, and pace, Dr. Jennings explained that Dana showed "some

decreased concentration" on her recent consultative exam, R. 118, and "would have difficulty

with workday completion and consistency," R. 119. In May 2018, DDS consultants Jack

Hutcheson, M.D., and Joseph Leizer, Ph. D., affirmed these findings. *See* R. 123–47.

B.    *The ALJ's Decision*

ALJ Knight discussed this evidence throughout her written decision. R. 21–31. She

determined that Dana had severe impairments of degenerative disc disease of the spine,

osteoarthritis of the right knee, osteoarthritis of the bilateral shoulders, essential hypertension,

obesity, depressive disorder, generalized anxiety disorder, Bipolar I disorder, and panic disorder.

In determining whether Dana's mental impairments met the criteria for Listing 12.04, ALJ

Knight determined that Dana had moderate limitations in her abilities to understand, remember

or apply information; to interact with others; and to concentrate, persist, or maintain pace; and

that she had a mild limitation in her ability to adapt and manage herself. *See* R. 22–24 (citing 20

C.F.R. pt. 404, subpt. P, app. 1 § 12.04).

Turning to Dana's RFC, ALJ Knight summarized Dana's subjective statements about her

symptoms, R. 25, summarized the medical evidence, R. 25–31, and evaluated the medical

opinion evidence of record, R. 27–31. She found that Dana's "medically determinable

impairments could reasonably be expected to cause some of the alleged symptoms," but that

Dana's "statements concerning the intensity, persistence, and limiting effects of th[o]se

symptoms [were] not fully supported for reasons explained in [her] decision." R. 25.

Nonetheless, ALJ Knight determined that Dana's mental impairments, and particularly her moderate limitations maintaining CPP, warranted some accommodation. R. 29–30. She then said that she "limited [Dana] to simple, routine tasks with no more than frequent interaction with the general public and infrequent changes in the workplace" to accommodate her mental health symptoms.[5] R. 29. ALJ Knight explained that "simple, routine tasks" specifically "addresses concentration, pace, and persistence" because such "tasks are by their nature less stressful and require less focus to maintain production standards." *Id.* Further, she said that "reducing the frequency of interaction with others simplifies interactions and lessens distractions, and [] also reduces stress and helps maintain production standards." R. 30.

ALJ Knight then explained her reasons for discrediting Dana's subjective statements regarding her symptoms. First, she found that Dana's subjective statements regarding her symptoms were "inconsistent because the objective medical evidence and [Dana's] report[ed] activity level do not support the level of decreased functioning as alleged." R. 30. Particularly, ALJ Knight relied on Dana's "generally normal" physical examinations, the lack of evidentiary support for a finding that she consistently required a cane for ambulation, and Dana's reported daily activities in discounting her alleged physical symptoms. *Id.* Regarding Dana's mental impairments, ALJ Knight noted her "ongoing mental health symptoms despite treatment," but observed that "mental status examinations have revealed generally benign findings," "there ha[d] been some noted improvement in [Dana's] symptoms with treatment," and her "treatment [was] conservative, consisting of medication and counseling and she [had] not required any inpatient hospitalizations and she remain[ed] independent in her activities of daily living." *Id.* ALJ Knight

---

[5] While ALJ Knight says at this portion of the opinion that she limited Dana to "infrequent changes in the workplace," R. 29, no such restriction appears in her actual RFC finding, R. 24. ALJ Knight's actual RFC finding also limits Dana to "occasional" interaction with supervisors, co-workers, and the public, R. 24, which is more restrictive than "no more than frequent interaction with the general public," R. 29.

listed Dana's reported abilities to attend to her personal care needs, shop, clean, cook, read, watch television, spend time with friends, knit, care for a dog, and attend medical appointments as "high level" activities demonstrating Dana's symptoms were less severe than alleged. *Id.* ("[T]he evidence reveals that the claimant has maintained a high level of activity despite her impairments.").

ALJ Knight then concluded that although Dana could not return to her past relevant work, she could perform certain unskilled "light" jobs that existed in significant numbers in the national economy, such as photocopy machine operator, cafeteria attendant, and router, for the period between June 1, 2016, and March 30, 2019. R. 31–33. She therefore found that Dana was "not disabled" prior to March 30, 2019, but that she had become disabled on that date because she moved into an older age category. R. 34.

C.    *Analysis*

Dana's challenges to the ALJ's decision primarily concern the RFC determination. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week (or equivalent schedule) despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC itself should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms"

26

that affect the claimant's "capacity to do work-related physical and mental activities" on a

regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780

F.3d 632, 637–40 (4th Cir. 2015) (restrictions identified at step three). Second, the ALJ's

decision must include a "narrative discussion describing" how specific medical facts and non-

medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL

374184, at *7, and logically explaining how she weighed any conflicting or inconsistent

evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court

will affirm the ALJ's RFC findings when she considered all the relevant evidence under the

correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th

Cir. 2017), and built an "accurate and logical bridge from that evidence to [her] conclusion[s],"

*Woods*, 888 F.3d at 694. *See Thomas*, 916 F.3d at 311–12; *Patterson v. Comm'r of Soc. Sec.*, 846

F.3d 656, 662–63 (4th Cir. 2017).

Dana asserts that the ALJ's RFC determination is deficient because it did not account for

her "moderate" overall limitations in maintaining concentration, persistence, or pace ("CPP").

Pl.'s Br. 9–11. According to Dana, limiting a claimant to simple or unskilled work does not

accommodate for moderate limitations in CPP. *Id.* at 9 (citing *Mascio*, 780 F.3d at 638). Rather,

Dana asserts that accounting for her moderate CPP limits required the ALJ either (1) to explain

why Dana's moderate limitation in CPP does not translate into a limitation in her RFC, or (2) to

impose additional restrictions beyond merely limiting her to "simple," "routine," or "unskilled"

work. *Id.* Further, Dana argues that a restriction allowing her to take a break every two hours

does not account for her moderate limitations in CPP because an ordinary 8-hour workday

already includes those breaks. *Id.* She also notes that "the ALJ did not identify what medical

records supported her findings that [Dana] has a two-hour attention span." *Id.*

When an ALJ at step three finds a "moderate" limitation maintaining concentration, persistence, or pace, she must either specifically account for that work-related limitation in the RFC finding or explain why such a restriction is unnecessary. *Mascio*, 780 F.3d at 638; *cf. Patterson*, 846 F.3d at 659 (noting that the "RFC assessment is a holistic and fact-specific evaluation" and "the ALJ cannot conduct it properly without reaching detailed conclusions" at steps two and three about the "type and severity of the claimant's [mental] impairments"); *Claiborne v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) ("The conclusions at step [three] are supposed to represent reasoned consideration of all of the pertinent evidence, and are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step."). Merely restricting the claimant to "simple, routine tasks or unskilled work" is not sufficient because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638 (internal quotation marks omitted). Similarly, an ALJ does not necessarily account for such limitations by reducing the claimant's interactions with other people or by restricting her to a "static work environment where changes in tasks are infrequent and explained when they do occur," R. 17. *See, e.g.*, *Seymour v. Berryhill*, No. 3:16cv62, 2017 WL 908213, at *3–4 (W.D. Va. Mar. 6, 2017) (reversing and remanding under *Mascio* where ALJ failed to explain how RFC limiting claimant to "simple, routine and repetitive tasks; . . . a static work environment where changes in tasks are infrequent and explained when they do occur; and occasional contact with the public, supervisors and coworkers" reflected ALJ's finding of "moderate" limitations maintaining CPP). Rather, the ALJ's decision must include a narrative discussion, citing relevant evidence in the record, *explaining* either how the RFC accommodates the ALJ's finding that the

claimant's mental impairment(s) cause "moderate" overall limitations in sustaining CPP or why,

notwithstanding that prior finding, this moderate limitation "does not affect" the claimant's

ability to "stay on task" for a full workday and normal workweek. *Mascio*, 780 F.3d at 638; *see,*

*e.g.*, *Lonie B. v. Comm'r of Soc. Sec. Admin.*, No. DLB-19-1424, 2020 WL 2097683, at *4 (D.

Md. May 1, 2020) (remanding under *Mascio* where ALJ discussed relevant medical evidence,

but "offered no explanation as to why Plaintiff's issues with concentration and persistence did

not affect his ability to sustain work over an eight-hour workday"); *Mark T. v. Berryhill*, No.

CBD-18-0513, 2019 WL 2250575, at *4 (D. Md. May 23, 2019) (ALJ's "detailed explanation of

the evidence in the record" was insufficient where ALJ failed to explain whether the mental

RFC's specific limitations adequately addressed claimant's moderate limitation in CPP).

Here, ALJ Knight explained how she accounted for Dana's mental impairments, and

specifically, her moderate limitations in CPP as follows:

> In order to accommodate the claimant's ongoing mental health symptoms, the
> undersigned has limited the claimant to simple, routine tasks with no more than
> frequent interaction with the general public and infrequent changes in the
> workplace.[6] Simple, routine tasks are by their nature less stressful and require less
> focus to maintain production standards. This limitation addresses concentration,
> persistence, and pace in addition to the other "paragraph B" criteria. In addition,
> reducing the frequency of interaction with others simplifies interactions and lessens
> distractions, and this also reduces stress and helps maintain production standards.

R. 29–30. The ALJ's first point that "[s]imple, routine tasks are by their nature less stressful and

require less focus to maintain production standards" was rejected by the Fourth Circuit's holding

in *Mascio* that "the ability to perform simple tasks differs from the ability to stay on task" and

that "[o]nly the latter limitation would account for a claimant's [moderate] limitation in

concentration, persistence, or pace." 780 F.3d at 638. Moreover, ALJ Knight cited no evidence in

---

[6] As noted, ALJ Knight's actual RFC finding, R. 24, does not restrict Dana to "infrequent changes in the workplace," R. 29.

the record for the proposition that limiting Dana to simple, routine work would allow her to stay on task.

I also find that ALJ Knight did not adequately explain how or why she found that limiting Dana to only occasional interaction with supervisors, co-workers, and the public would accommodate for her moderate limits in CPP. The ALJ found that "reducing the frequency of interaction with others simplifies interactions and lessens distractions, and [] also reduces stress and helps maintain production standards." R. 30. Although a restriction that addresses a claimant's distractibility could reasonably accommodate her moderate limitation in CPP, the ALJ did not explain how such a limitation applied to Dana's RFC. She did not cite concerns or evidence about distractions from others as a reason for finding a moderate limitation in CPP at step three, R. 23, and her RFC analysis did not identify such concerns or evidence, R. 25–31. Without an evidentiary basis or an adequate explanation, I cannot find that this restriction accommodates Dana's moderate limitation in CPP. *See Yates v. Comm'r of Soc. Sec.*, 4:16cv59, 2018 WL 1249926, at *11 (W.D. Va. Feb. 16, 2016) ("But the ALJ must explain, *citing relevant evidence from the record*, how restricting the claimant to such tasks accounts for her actual limitations in maintaining concentration, persistence, or pace.") (emphasis added).

Additionally, the ALJ included a limitation in the RFC that Dana could "concentrate for periods of two hours on said work related tasks before requiring a break." R. 24. The ALJ's RFC analysis, however, does not mention this two-hour limitation. Dana correctly asserts that ALJ Knight failed to identify any evidence supporting her finding that Dana could stay on task for two hours before requiring a break despite having previously found she had moderate CPP limitations. *See* Pl.'s Br. 11. Indeed, the medical opinions suggest that Dana would have significant difficulty maintaining CPP during a normal workday and workweek. *See* R. 119, 143

(DDS opinions that Dana had moderate CPP limits and "would have difficulty with workday completion and consistency"); R. 492 (Dr. Cousins's opinion that "during periods of mania" Dana would require frequent redirection to tasks presented to her, and that she was "unlikely" to complete a normal workday or workweek without interruption). Without a basis in the medical opinions for this limitation, Dana's case is unlike *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017), where the Fourth Circuit found that the ALJ properly relied on the opinion of a state agency consultant in concluding that the claimant could stay on task for two hours at a time in certain workplace environments. Thus, ALJ Knight failed to build an "accurate and logical bridge from th[e] evidence to [her] conclusion" that Dana could concentrate for two hours before requiring a break. *Woods*, 888 F.3d at 694. Accordingly, I find that the ALJ's determination is not supported by substantial evidence.

Dana also argues that ALJ Knight erred by providing legally inadequate reasons for discrediting her subjective statements regarding her symptoms at step two of the *Craig v. Chater* pain analysis. The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565;

31

*see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c).

The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's credibility determination if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

In assessing Dana's RFC, ALJ Knight first found that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." R. 25. She then found that Dana's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not fully supported" for several reasons. *Id*. As to Dana's physical symptoms and alleged limitations, ALJ Knight found that her statements were "inconsistent because the objective medical evidence and [Dana's] reported activity level [did] not support the level of decreased functioning" alleged. *Id.* She observed that "the medical evidence does reveal

ongoing chronic pain complaints in her neck, back, shoulders, and knee," and "[o]bjective imaging studies have demonstrated abnormalities in her cervical and thoracic spine, and imaging has demonstrated arthritis in her shoulders and knee." *Id.* She also found, however, that "physical examinations [were] generally normal, including noting no focal neurological defects, no sensory or motor strength defects, intact cranial nerves and generally normal gait." *Id.* Further, she determined that "the record [did] not provide support for a finding that [Dana] consistently requires a cane for ambulation." *Id.*

Regarding Dana's mental symptoms and alleged limitations, ALJ Knight discounted their alleged severity based on "benign findings" on mental status exams, noted improvement with treatment, and the "conservative" nature of Dana's course of treatment. *Id.* The ALJ also identified Dana's testimony that she could "attend to her personal care needs, shop, clean, cook, read, watch television, spend time with friends, knit, and care for a dog," as well as her ability to attend medical appointments as further evidence that both Dana's physical and mental symptoms were not as severe or functionally limiting as she alleged. R. 30.

The ALJ's credibility analysis of Dana's physical symptoms was deficient. Dana did have many physical examinations that revealed "generally normal" findings. *See, e.g.,* R. 441–42 (no remarkable findings); R. 512 (same); R. 618 (steady ambulation with limp favoring right, able to walk on heels and toes, full and painless spinal ROM, no assistive devices); R. 779–80 (obesity but no other remarkable findings). Dana's imaging, however, as well as many of her physical examinations, also revealed abnormal findings on many occasions. *See, e.g.,* R. 500 (decreased ROM in cervical and thoracic spine, shoulders, and hips); R. 661 (right shoulder X-ray showing "massive rotator cuff tearing"); R. 712–13 (tenderness to palpation, "increased tissue turgor along the suboccipital, supraspinatus, and periscapular region," 3+/5 left shoulder

flexion, extension, and external rotation); R. 584 (restricted ROM in neck, tenderness to

palpation posteriorly and over AC joint in left shoulder, pain with abduction of left shoulder past

90 degrees); R. 873 (decreased cervical ROM, decreased right upper extremity strength, positive

Hoffman's); R. 840 (noted to ambulate with cane intermittently, slightly antalgic gait, mild

tenderness to palpation overlying quad tendon and patella, resistive range of motion in knee

flexion and extension). Although the ALJ mentioned some of these findings in her summary of

Dana's medical history, she did not explain why she found them to be less persuasive than the

records showing more normal findings. Moreover, in her analysis of Dana's symptoms, the ALJ

did not discuss the extensive treatment Dana underwent for her physical impairments. During the

relevant period, Dana underwent a reverse total shoulder arthroplasty and a distal clavicle

resection, R. 554–55, and had a right patellofemoral arthroplasty. R. 838.

Despite these many abnormal exam and imaging findings, the ALJ determined that

Dana's "statements about the intensity, persistence, and limiting effects of her symptoms" were

inconsistent with both the objective medical evidence and her daily activities. She cited to

"generally normal" exam findings and the fact that the record does not support a finding that

Dana consistently required a cane for ambulation as her reasons for doing so. While these

reasons do offer some support, the ALJ was also required to consider the conflicting evidence of

record and adequately explain how she resolved those conflicts in reaching her conclusions. It is

unclear from her analysis how, based on all of the evidence of record, she determined that Dana

maintained the RFC to perform a limited range of "light" work considering the record as a

whole. In other words, she did not build an "accurate and logical bridge from th[e] evidence to

[her] conclusion" that Dana's physical symptoms were less severe or functionally limiting than

alleged. *Woods*, 888 F.3d at 694.

ALJ Knight's reliance on Dana's reported daily activities in discrediting her subjective statements regarding the symptoms from her physical impairments is likewise flawed. While an ALJ may properly consider a claimant's daily activities when assessing the credibility of his or her alleged symptoms, *see* 20 C.F.R. § 404. 1529(c)(3)(i), the ALJ must consider the type of activities performed as well as the extent to which the claimant is able to perform them. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). "The 'critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer.'" *Tanzi F. v. Saul*, No. 3:19cv167, 2021 WL 3205050, at *6 (E.D. Va. July 8, 2021) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, ALJ Knight identified Dana's abilities to attend to her personal care needs, shop, clean, cook, read, watch television, spend time with friends, knit, care for a dog, and attend medical appointments as evidence demonstrating that Dana maintained a higher level of functionality than she claimed. R. 30. Nevertheless, she did not discuss the many limitations Dana attested to in her abilities to perform many of these activities, and she never explained how Dana's ability to perform such activities, in the limited extent alleged, demonstrated an ability to sustain full-time employment.

For instance, although ALJ Knight relies on Dana's purported ability to care for a dog, Dana said in both of her Function Reports that her mother did most of the work caring for their pets. R. 238 (Dana stating that her mother did most of the work caring for their dogs, although she would let them out the back door, give them treats, and sleep with the older dog); R. 256 (Dana testifying that her mother "does the majority of feeding [and] walking"). Further, although

Dana wrote in her July 2017 Function Report that her hobbies included knitting "at times," she testified at the hearing that while she had recently "pulled out her knitting" supplies, she had not actually knitted in eight years because of problems with her fingers. R. 63. Additionally, Dana said she had limitations in her abilities to cook and clean. *See* R. 239 (Dana stating that she does "light laundry," cleans the kitchen "at intervals," and cannot vacuum due to pain); R. 257 (Dana stating that her "back hurts" when cooking); *see also* R. 490 (Dr. Cousins's note that Dana "mentioned she would do the cooking, though she was quick to remark that she can only stand for about 15 minutes before her back starts to hurt"). And, although she shopped, she stated that she would usually do so at night because of her anxiety in crowds. R. 258 ("I usually go at night get anxious in crowds."); *see also* R. 537 ("Client states that she has to go to the store at times when there are not many people there due to anxiety."). Although Dana described no or very little limitation in her ability to perform some of these activities, such as watching television and attending to her personal care needs, the ALJ was still required to explain how her ability to perform these activities reflected her ability to maintain full-time work.

Based on ALJ Knight's discussion, it is entirely unclear how she determined that Dana's ability to perform some activities, in the severely limited extent she alleged, demonstrated that she maintained an RFC to perform a limited range of "light" work. *Arakas*, 983 F.3d at 99 ("[T]he ALJ failed to adequately explain how her limited ability to carry out daily activities supported [her] conclusion that she could sustain an eight-hour workday."). As such, ALJ Knight's reliance on Dana's daily activities in support of her discrediting Dana's subjective allegations regarding her physical symptoms was erroneous. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.").

ALJ Knight's analysis as to Dana's alleged mental limitations suffers from similar flaws. In discrediting Dana's subjective allegations regarding her mental impairments, ALJ Knight first observed that Dana "ha[d] ongoing mental health symptoms despite treatment with medications and counseling." R. 30. Nonetheless, she also noted that "mental status examinations have revealed generally benign findings" and that there had "been some noted improvement in [Dana's] symptoms with treatment." *Id.* Further, she found that Dana's "conservative" treatment of her mental impairments and her activities of daily living demonstrated that these conditions were less severe than alleged.

ALJ Knight's reliance on Dana's activities of daily living as a means for discrediting her subjective testimony about her mental impairments is erroneous, as explained above. Her reliance on Dana's "conservative" treatment and reported improvement with medication is questionable. Although the ALJ correctly identifies that Dana did not require inpatient hospitalizations for her mental impairments, the type of treatment Dana received does not appear to conflict with her subjective statements regarding her mental impairments. *Cf. Monroe*, 826 F.3d at 189 ("The ALJ cited evidence that he appeared to believe tended to discredit Monroe's testimony regarding his claimed episodes of loss of consciousness and fatigue. However, he failed to build an accurate and logical bridge from the evidence to his conclusion that Monroe's testimony was not credible."). Dana regularly took medications and attended therapy for her mental impairments. *See, e.g.*, R. 537, 539, 542–44, 814, 822–23, 828–30, 843, 849, 852, 868–70. She did report improvement from her medications on occasion. *See* R. 810 (Dana's irritability noted to be doing "much better" and her sleeping "fair" after increase in gabapentin); R. 849 (Dana reported improvement and a decrease in crying spells after increase in Zoloft). On other occasions, however, Dana also said that her medications were ineffective in controlling her

mental impairments. *See* R. 814 (Dana saying Prozac did not offer relief); R. 843 (Dana reporting no improvement after increase of Effexor); R. 869 (Dana stating the Klonopin did not offer relief and her anxiety was worse). And, although the record demonstrates periods of improvement, Dana consistently reported problems controlling her anxiety. The ALJ did not explain why occasional improvement in symptoms led her to question the severity of Dana's symptoms throughout the relevant three-year period.

The ALJ's reliance on "generally benign findings" on mental status exams overlooks key evidence. Surely, there were many occasions on which Dana's mental status exams revealed "generally benign findings." *See* R. 784. Just as with Dana's physical impairments, however, exams also revealed abnormal findings. *See* R. 491 (Dr. Cousins noting Dana's mood and affect were "quite labile" and that she "essentially . . . presented as an individual in a manic episode" on exam); R. 539 (depressed mood, mildly restricted thought process); R. 850 (depressed mood, mildly restricted and congruent affect); R. 857 (tearful, showed signs of depressive-like and manic-like behavior).

Moreover, for mental impairments, some fluctuation in symptoms and examination findings is common. *See Testamark v. Berryhill*, 736 F. App'x 395, 398–99 (4th Cir. 2018) ("Because symptoms of mental illness may wax and wane over the course of treatment, the fact that Testamark exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that she is unable to work."). Given the mixed evidence in this record, the ALJ should have taken care to balance the normal and abnormal exam findings and Dana's history of therapy and numerous prescription medications in explaining how she determined Dana's actual impairment-related mental limitations. Accordingly, I find that

substantial evidence does not support the ALJ's assessment of the credibility of Dana's subjective statements regarding both her physical and mental impairments.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Dana's Motion for Summary Judgment, ECF No. 17, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 24, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 4, 2022

Joel C. Hoppe
United States Magistrate Judge

39